C.S. did submit expert testimony based on evaluations that had occurred after the due judgment was given to the school district, and they just changed their testimony. They repeated and then changed it. They had no new reasons. There was no... But, counsel, if you've introduced some new evidence, what would be wrong with allowing the school district the opportunity to bring in witnesses to offer additional testimony that perhaps wasn't relevant the first time because you didn't have your new witnesses, your new evidence? Your Honor, everything that we raised was raised in the administrative hearing process. For example, the evaluation for learning disabilities. We raised that issue and the district had no... So why, counsel, did you... Why did you have witnesses testify then? Well, it's almost exactly the same situation as in Ojai. We had a psychologist do an evaluation once again to confirm that he has specific learning disabilities. And in Ojai, that's exactly the kind of report that was allowed in that said this later acquired evaluation gives insight into the child's condition and into the actions of the school district at an earlier date. So did the school district's... The witnesses that testified again for the school district, did they respond to the witnesses that you had... You know, what your witnesses had said? They did not, Your Honor. The only way they responded was to change their reason for not identifying him as a student with specific learning disabilities. Otherwise, they repeated their testimony. They did not offer expert opinions in rebuttal to our expert. Instead, they're only... Well, they rendered one and their expert opinion was we provided a free of appropriate public education to CS. Well, that's a legal opinion. That's a legal conclusion. So they did not respond. If they had, that would be a different story, but they just went on and gave different reasons for what they did before. Now that they saw what some of the strongest issues were and what some of the problems were from the hearing. The other thing at the same time that the district court gave the school district a second bite at the apple is they excluded CSS expert testimony from the administrative hearing. And the court did this by applying the wrong legal standard. The court applied the federal rules of evidence to expert testimony admitted in the administrative proceeding that was governed by the Montana rules of evidence. So the district court applied federal rules and applied the Doe-Bear standard to Dr. Gentry's testimony and concluded that he was not qualified to give opinions and that his inclusion as an expert was not warranted. And this is error because the Montana law is clear that Montana rules of evidence are covered in due process hearings and Montana does not apply the Doe-Bear standard. But even if it did, Dr. Gentry qualifies. The district court's finding that he had not worked with schools to design these, quote, so-called IEPs is just clearly erroneous. It's contradicted by Dr. Gentry's own testimony that he has worked with school districts to evaluate students with disabilities and design educational programs hundreds of times. It's just that he wasn't on the payroll. He was a contracted expert and consultant, and he has testified numerous times as an expert in special education due process proceedings. He is a school psychologist. He's a clinical psychologist, and he's a board-certified behavior analyst doctorate level. I mean, for special ed, you can hardly find a more qualified expert than Dr. Gentry, so that was wrong. There were other evidentiary errors that are too numerous to list, but I want to give a few examples. One is the district court prohibited counsel from impeaching the special ed director and the special ed teacher after they gave false testimony. The district court prohibited Dr. Roach, our expert, from criticizing the school district's faulty evaluation, which is, of course, a core issue in this case. And the school district prohibited Mr. McCarville from testifying as a parent because the district court refused to recognize the Montana Supreme Court decision that said that Butte School District should have secured the appointment of McCarville, that he qualified as a parent under IDEA and Montana law. But instead, what the Butte School District did was they secured the appointment of a complete stranger, Mahoney, to serve as his surrogate parent. And the Supreme Court decision that's been fully litigated, they decided that that was a legal error. It was remanded. The district court appointed Mr. McCarville retroactively to the date that the school district first obtained the appointment of Mahoney. And the district court said that this parental rights issue is ancillary to the issue of fate. And that just flies in the face of the IDEA and numerous U.S. Supreme Court decisions that say the IDEA affords parents significant procedural rights and safeguards, and the importance of which cannot be gainsaid in the very first case, 1982, the Rowley case. So, Counsel, your time is going very quickly. I'd like you to turn to the to the fake questions, and I'd like you to direct you to the transitional services question. You prevailed before the hearing officer for the 2011-2012 year. The hearing officer concluded that CS was denied a fake for that year on those services. So here is my question. Let's presume for purposes of my question that I agree that the IEP was utterly insufficient, that it was not specific enough, that there were no goals that were identifiable. What is the harm? What would have been done if they conducted a proper IEP? What services would CS have been provided in 2011-2012 that he was not provided? He would have received transition services that actually matched his needs and his strengths and his interests. Okay. I want to be very specific. What wasn't he given? Was he given any services at all that would have related to transition? He was taken to the community, to the grocery store, and he was given a job in the school store that he did about once a week, I think. But he has autism. He has trauma. He has sensory issues, and being in a school store in the middle of a busy school was actually contrary to what would be good for him for a job. He had an interest in drafting. He's quite a prolific artist and drafts a lot of technical things. There was nothing related to his interests, and the whole foundation of the transition services is that they must relate to the student's preferences, strengths, needs, and interests. And so they did not. Can I ask you a question about that, Counselor? In his, I guess, 2012-2013 year, did he have any of that sort of training that year after he had more of an assessment, or did he not have any of that either the two years? No, he did not have any. I think when I described earlier, I meant to say that's what he received in the 2012-2013 school year. Was he in the Crossroads Day Treatment Program in the 2011-2012 year also? Yes, Your Honor. He was in that program both years. And doesn't that have a certain amount of, I mean, sort of transition-type services built into it? It seems like, from my reading of the record, they have a lot of generalized transition services kind of built into that program. They have a few, Your Honor, but not the ones that match his needs. And you can't do adequate transition services without age-appropriate transition assessments. That's a clear statutory requirement that the district court ignored entirely in a single paragraph with no analysis. And in addition—  You say you can't do it, but, I mean, there are cases out there that since you have to show not only that they didn't get an assessment, but that it resulted in some sort of harm. They had some prejudice from it. So, in theory, you could get transition services because the school was providing you some transition services even though they didn't do the assessment. So, I don't think it's right as a matter of law to say that just because they didn't do an assessment that that is reversible error, unless you can also show some harm from that. There is a core tenet of the law is that it must be individualized. And it was not individualized. Neither were behavior services or the goals for his learning disabilities. There were none. And I see my time for rebuttal is up. So, with that, I think I'll reserve. Thank you. Thank you, Council. You can proceed. If it pleases the court, Council, good morning. My name is Patrick Thomas Fleming. I'm a partner in the firm of Fleming and O'Leary from Butte, Montana. I represent school district number one in this matter. I want to try to follow in the order that Ms. LaRose approached this matter, and I'll do so now. Initially, Ms. LaRose, I believe, misstated the genesis of the supplemental hearing. Let me explain. Initially, there was a hard look at what we were going to be allowed to put on, if anything. And the district initially considered putting on additional testimony. As we proceeded, Ms. LaRose listed at least one expert and insisted that that expert be allowed to testify. At some point, and again, this was throughout. I have to tell you that we had Judge Haddon, who was actively engaged, trying to get to resolution in this matter. I don't think he did anything unilaterally. We had discussions, and he was trying to get a position for us. At one point, the district offered, and this is found at a docket entry 18.5 at page 167 of the record. And let me read it verbatim so I'm not misquoting. Mr. Fleming, Your Honor, if the court does not grant any additional supplementation to CS, we're satisfied with the record as it exists. We have noted that in one of our pleadings, Your Honor, when the court denied and asked us to refile, we evaluated the record and made a determination that the administrative record, with all objections in all of our positions, is satisfactory to go forward. The court. As I understand that statement, counsel, your statement is premised upon the court making a determination that Dr. Rote is not going to be added as a party, as a witness to the record. Correct, Your Honor? That's our position at this point. So at this point, Your Honor, and I believe this date was, it does not have the date on the transcript, but this date was fairly early on. The district indicated that we did not need supplementation, would not need to go forward, and Ms. LaRose and CS's team rejected that. They insisted that they be allowed to call a witness and that witness was Dr. Rote on that basis. That's why we had a supplemental hearing, not because of anything the district court did, Your Honors, but simply because Ms. LaRose and her team insisted there be a supplemental hearing. At one point, Ms. LaRose's position was, I get to call Dr. Rote, but the district does not get to call any other witnesses. In fairness, judge hadn't rejected that and said, we'll go forward. I want you guys to disclose and I want to have a complete disclosure of the witnesses you intend to call. At that point, judge offered Ms. LaRose and her team to go forward with the trial as it was currently and use only the administrative record for purposes of a decision. Ms. LaRose and her team rejected that. We went forward with, as Judge Haddon called it, a modified schedule. He indicated that he would allow witnesses and we should identify the witnesses. We did. We went through another round of motions in limine and discussions. And at the end of the day, Judge Haddon simply said, okay, here's the deal. I'm going to, in fairness, allow CS to present whatever testimony he wanted. And I'm going to allow the district to present whatever testimony they want in supplementation of the record, not a trial de novo. Now, at that point, your honor, we went into the trial mode and Ms. LaRose and her team called two completely new experts. And at least one other individual associated with the IEP process at the district court level. The district was then allowed to call Josh Shadd, Joy Leva, and Ms. Cannon. And I go through it in detail and the court should review the record. The Josh Shadd, Joy Leva, and Ms. Cannon did not change their record, did not change their testimony. They were asked on direct examination whether or not they adopted the previous testimony in all respects. They did. And then they were allowed to present testimony essentially that rebutted the two new expert witnesses that Ms. LaRose called and all the assertions made by those two witnesses. The court is encouraged by me to review the expert testimony of those two witnesses and compare that to the testimony of what Shadd, Cannon, and Leva presented. It was rebuttal. It was directly contradictory to what they had said or their position with regard to it. The other thing that they presented, and I think this is important for the court to understand, they presented testimony and questions from the judge. Council, can I go ahead and interrupt you on that because the clock is running out. And I think I'm interested in this issue of whether or not the Butte School District provided a case in the 2011-2012 year when they didn't do an assessment, when the school district didn't do an assessment. That's one question. And the other is your answer to the exclusion of, and I apologize, I don't remember his name, but the person from being able to participate as a parent. Thank you, Your Honor. And what I want the court to address is you're talking about an evaluation. Are you talking about, because there were evaluations alleged in this case that claimed not to be done that were necessary by the expert witnesses. One of the evaluations that was claimed not to have been done is for a specific learning disability. Is that the evaluation you were looking at, Your Honor? I'm talking about the assessment in order to figure out what kind of transition services to offer. Your Honor, I think, and I don't want to belabor the record, but I think Judge Haddon, in his unconventional findings, listed all of the things that they had done for transitional services. And they were far more extensive than represented by… That's what I'd like to know. I guess what I'd like to, it's a little difficult to tell from the record what transitional services were offered in the 2011-2012 year versus the 2012-2013 year. Because as I read the record, there was no assessment done for that first year, for what might be called his junior year. But there was an assessment done for his senior year, but it's a little, and tell me if I'm wrong about that, but it does seem like there were some transition services offered for both years, but it's not clear to me exactly which ones were offered in each year. Your Honor, I would suggest to you that, first of all, Judge Haddon, in detail, set out those records. Well, no, he didn't. He didn't. All he did is he listed a long list of transition services that were offered, but he didn't describe it by year. He didn't break it down by year. I'm sorry, Your Honor. Those transitional services were offered in both years. There was no change in the transitional services. What the district's program was, Your Honor, was they had Mr. Skias and provided the transitional services that are identified in Judge Haddon's record, and they were testified to by Mr. Shadd and Ms. Leva at the administrative hearing level, extensively discussed. Now, off the top of my head, Your Honor, let me talk to you a little bit about those services. First of all, they tried to mainstream CS as much as they possibly could. They worked extensively with him on the transportation system. He worked in the school store. He participated in voluntary activities in and around Butte, Montana, where he could be. He was taken to the YMCA with the other class members, and he was provided all of those services. In addition, one hour each day he was provided services from, I believe the name is Alta, and they were a separate independent contractor. And the testimony in the record is that they provided services, life skills services, teaching CS to cook, teaching him how to behave and be appropriate around people, teaching him with respect to job interviews, things of that sort, things that he should do. Additionally, Your Honor, the Alta group, and with respect to Mr. Shadd and Ms. Leva, worked with him with CS extensively on care and cleanliness, hygiene, things of that sort. So to be clear, and you're saying all of this was provided both years? Absolutely, Your Honor. So what about Ms. LaRose's point that it sounds like they did provide a lot of transition services, but it doesn't appear, I mean, these things you're talking about sound like, to me, like useful things for people to know when they get out of school, but they're kind of the useful things that everybody would want to know. What about the fact that it doesn't sound like he was provided anything individualized, even after he got an assessment in his senior year? I don't think that's accurate, Your Honor, but let me give you an example. Ms. LaRose talked a little bit about drafting, which is one of the interests that he disclosed. In the record, you'll find that the drafting class was at Duke High School, which is an independent high school from the crossroads. And in the course of the proceedings, Stuart McCarville et al. requested that Mr. C.S. be allowed to go to Butte High School to participate in a drafting class with the mainstream students. Ms. Cannon took him, him being C.S., on two occasions to Butte High, which is where the drafting class occurred. So unable to, Mr. C.S. didn't like Butte High, and so on his own, he wrote a letter that you'll find in the record to everybody saying, I don't want to go to Butte High School. I don't care, even if there's a drafting class, I will not go there. So that drafting opportunity was not availed to Mr. C.S. because of that. But I think if the court will look at the record... Did the school district consider providing some kind of drafting tutoring outside of the classes offered at Butte High School? Yes, Your Honor. In fact, that's what I was just getting to. What they did was they provided art classes to him through the crossroads program and worked extensively with him drafting and doing those things. I think the record will show that Josh Shad indicated that he worked daily on drafting and things of that sort. Mr. C.S. was extremely interested in art. They worked hard on art. They took him to places where he would be exposed to art. They had art teachers come in. Mr. Shad, Mr. Leiva, and others worked with C.S. who was equally interested in art. On a daily basis, he was given that artwork. Candidly, I'm not sure C.S. would have ever been able to handle the drafting classes at Butte High School, but he chose not to. There was never, ever a request after that to follow up on drafting. I want to point out, too, something that I think is important for the court to know. What we're looking at here is the IEPs, of course, are independent education plans, are critical, and they were essentially exhibit number eight in this matter. You can see the extensive classes that he was given, and then you have to compare that with the testimony. He was giving mainstream classes. He was being taught how to handle money. The focus of his education wasn't calculus or trigonometry. The focus was actual day-to-day learning of it. What's, I think, critical that oftentimes people forget in this matter is all of these transition plans were approved by the IEP team. This wasn't a unilateral statement by the school district of what they would apply. When you read the record, you will see that all of these things were eventually overwritten with CS, and all of the transition plans and the IEPs that were used to educate Mr. CS during the two years that are issued in this case were approved by the IEP team. They were approved by his parent, and in a unique case in here, CS turned 18, and he became the decision-maker. At that point, he excluded him, and so all of these things were agreed to by CS. What's critical for the court to understand is he agreed to them, and all of the professionals associated with the IEP team also agreed to them. Then the second prong of that is that the testimony is undisputed that the Crossroads program, Shad and Leva, followed the program religiously. The IEPs were followed to a T. What was agreed to be provided by the district in conjunction with the IEP team was provided. Counsel, we're running out of time here, and I want to direct you to the second question. What about the argument that McCarville was not appointed to be CS' educational representative, and I think the Montana Supreme Court later found that that was wrong? What is your argument in response to that? Your Honor, it's twofold. One is what happened, and you have to understand the process. What happened in this whole process is CS excluded his mother from the IEP teams, and at that point in time, he became the decision-maker, and so there was an OPI decision, and that OPI decision is a part of the record, and in essence, in the OPI decision, they said, appoint somebody. District, appoint somebody, and they put specific criteria. That's set forth in my brief here. The district went to following OPI's orders, which is the Office of Public Instruction in Montana ordered the district to appoint someone to be a surrogate parent, and they set out the criteria. Took that criteria to the county attorney's office here in Butte, and the county attorney's office appointed, went through the process, and through an individual by the name of Judge Brad Newman appointed. Why didn't they pick McCarville? First of all, if you take a look at that, McCarville was – take a look at the criteria that they set forth, and then take a look at the criteria which is established by Judge Haddon with regard to the criteria. McCarville just did not meet the criteria. He was involved in the financial decisions, and OPI told us don't make him that. Now, it's more important than that, Your Honor. What I want to stress is Mr. McCarville, even though he was not appointed surrogate parent, always participated and fully participated in all of CS's IEP. Is that your second? Go ahead, Judge Reilly. I think the thing that concerns me is, I mean, I hear the path dependence of your argument. I hear OPI telling you to appoint somebody not McCarville. You didn't think he was qualified. You did due diligence, went in to court, got something appellate. But the Montana Supreme Court overturns all of that. So I'm not sure why Judge Haddon gets to decide that the school district did the right thing if the Montana Supreme Court has said it didn't do the right thing. Judge Haddon did not decide that they did the right thing. If you take a look at Judge Haddon's decision, what he said is this. The non-appointment of Stuart McCarville as surrogate parent had no effect on A, CS's education because Stuart McCarville continued to participate as a full member of the team, was always invited, had access to CS, and CS was making the decisions. And so McCarville was a key part. So essentially what Judge Haddon said, and I apologize, what Judge Haddon said was, hey, this was harmless error. And it was well after the fact. He at no point said that McCarville, because there is no evidence. So, counsel, I think we've run over a little bit. I see your argument, and I think it was in your briefing that it was harmless error. Judge Cardone or Judge Bivey, do you have any follow-up questions? Do you want him to answer more of your question, Judge Bivey, that you're asking? No, I'm good. Your Honor, could I answer one question? I didn't get to Dr. Gentry. That was one of the questions posed. I'm not going to be long on Mr. Gentry. Andre indicated that Judge Haddon used the wrong standard. He did not. If you take a look with respect to Mr. Gentry, what happened is we took a deposition of a judge, Mr. Gentry, and he was wholly unqualified to serve as an expert witness under any criteria. And my argument... Counsel, I think we've got your answer on that. Unless, Judge Bivey, Judge Cardone, do you need to hear any more on that? No. So, it cut you off, but you've gone over a little bit. Go ahead and proceed, Ms. LaRose. Thank you. Go ahead. So, first of all, with regard to Mr. McCarvel, the Office of Public Instruction didn't say don't appoint him. They said consider whether he has conflict. He was paid modestly to be a foster parent. The OPI decision did not mention a really important provision of IDA, which is that when a student becomes an adult... What about the prejudice thing seems to be the stronger argument, where they say, well, you've got to participate anyway. So, what is the response to that? Actually, the legal determination was that he didn't have the ability to give consent to his educational programs. And so, what the school district did was whatever he said wasn't informed consent. So, they play up that he consented to things, but actually the 2011 IEP that was signed by his mother, she wrote within two weeks saying it's not adequate. It doesn't meet his transition needs or his behavior needs. And when CS had appointed a power of attorney, knowing that he needed help with education decisions, the school district ignored that. And they said, actually, they put a stop to the IEP process and said, we're not going to do any more. We're not going to revise the IEP until a court determines his ability. And then they didn't seek any input from a court until February 2013. So, from the beginning of the 2011 year all the way until February 2013, they implemented the 2011 IEP, but they did not implement it to a T. The IEP required vocational assessments. They didn't do them. The IEP required a functional behavior assessment by a board-certified behavior analyst. They didn't do that. And, you know, I noticed that. Was McCarvel asking for these things? I guess I'm really trying to pin down what was the prejudice from not having McCarvel as an educational representative or whatever the title was. Sorry, my table just went down. The prejudice is that Mr. McCarvel, a parent has many legal rights that the school district did not honor. If he asked for an evaluation, then they have to provide it unless they go through some process. But did he do that? That's what I'm trying to get at. I mean, I see that, like, in theory he could have done a lot of things, but was there stuff he asked for that didn't happen? He asked multiple times, and I do think I listed in the opening brief, how many times he asked for a functional behavior assessment and how many times he asked for transition services and transition assessments. And even at that last IEP meeting in 2013, he asked for transition assessments because those are his biggest needs. He's almost out of high school, and one of the biggest areas of need for transition is behavior. And in May 2011, the school district said, we need an FBA from a qualified applied behavior analysis professional, and they never obtained it. And that was critically important to him because his behaviors worsened, and they were really only apparent in the school setting. Mr. McCarville did not have problems with his behaviors at home, but they worsened to the point that it was school officials' reports that led to an involuntary commitment. If I can, I want to address the transition. I did misspeak earlier when I described those services as being part of the 2011 year. They were only in the 2012-2013 school year, and that's at 14-12 through 13. You'll see that they didn't start until October 2012. The description, Counselor, Just to be clear, Counselor, are you saying that he did not get any transition services in his 2011-2012 year? I don't believe he did, Your Honor. He may have gotten some instruction in the classroom about different things, but the activities, the records, Butte's education records show that he only received those community and other transition activities during the 2012-2013. Counselor, you just pointed us to an activities log. Now, the activities log was kept in 2012-2013, but it was not kept in 2011-2012. But the absence of an activities log doesn't mean that there were no activities. And Ms. Liva, in particular, testified to a very long list of things, many of which are not listed on this log, which means that if they came, they may have come in a different year. Because there are things that are reflected on her list that do not appear on the activities log. Okay, and if you believe her testimony about that, then all I can say is that it wasn't individualized. It wasn't based on the assessments that IDEA requires. And I see that. If you have something more, your opponent ran over a little bit, so feel free if you have something else to say. I have a question for you, Ms. LaRose. So let's suppose, for purposes of my question, that I thought that the hearing officer was correct on the lack of 2011-2012 transition services. Let's just focus on that for now, just to keep this question simple. If we agree with you there, what's the remedy now? You go back, you perform a transition services evaluation that should have been done in 2011 and provide those things to him now so that we give him a drafting class now? The relief that you've outlined to the district court, I have to tell you, from my perspective, is breathtaking. Almost $600,000 worth of evaluations and one-on-one, that doesn't sound like a drafting class that we're trying to make up time for. So what's the remedy if I think that there's a 2011-2012 violation on the transition services? Well, the remedy is some compensatory education, and it is compensatory education targeting his behaviors and his employment skills. And so that can be ordered. It may not need to be as extensive as what we requested, but the paucity of appropriate educational services for this young man was extensive. So it takes an extensive fix, and as well, as our expert testified, with the passage of time and his brain becoming less elastic, it's going to take more intensive services to make up for what the school district didn't do, and he wasn't able to build on those. There's one point I want to make about the learning disability evaluation. I do think that's a critically important issue, and even the factual finding that the court made, which was clearly erroneous because it's an improperly admitted testimony, it's also a mischaracterization of the record. The school witnesses, when they changed their story, said that the mother opposed classifying him with a learning disability. Evaluation and classification are two different steps in the process, and the parental complaints are not required to classify a student. That's an affirmative obligation that this court has said time and again, starting in target range and in many other cases since. It's an affirmative obligation that they cannot blame the parents for. Well, thank you, counsel. Judge Bybee, Judge Cardone, do you have any additional questions? No. All right, well, thank you both. Counsel, this case will be submitted, and I think this is the only case we have argument in. Judges, I think if we stay on, we'll be able to talk afterwards. All right. Thank you, Your Honors.
judges: Bybee, Vandyke, Cardone